STATE OF NORTH CAROLINA v. EDWARD LEMONS

No. 377A95

(Filed 9 July 1998)

**1. Constitutional Law § 344 (NCI4th)— capital murder—
prospective jurors—oath outside defendant's presence—
no right to be present**

A capital first-degree murder defendant's constitutional
rights to be present at every critical stage of his trial were not vio-
lated when the trial court failed to require that prospective jurors
take their oath in defendant's presence. The trial court's remarks
to the jurors once they were brought into the courtroom demon-
strate that the jurors had been preliminarily sworn, oriented, and
qualified for jury service without regard to any particular case or
trial and defendant had no right to be present when they were
preliminarily sworn in.

**2. Constitutional Law § 344 (NCI4th)— capital murder—indi-
vidual voir dire—prospective jurors outside courtroom—
clerk's administrative question—right to be present—not
violated**

A capital first-degree murder defendant's constitutional
rights to be present at every critical stage of his trial were not
violated where voir dire was conducted on an individual basis,
prospective jurors awaiting questioning were in a room out-
side the courtroom, and the clerk entered the room outside the
presence of defendant and asked whether anyone had not
filled out a jury questionnaire. The clerk merely sought to carry
out the administrative duties which the trial court had requested,
the challenged communications did not relate to the considera-
tion of defendant's guilt or innocence, and defendant failed to
demonstrate how his presence would have been useful to the
defense.

**3. Constitutional Law § 261 (NCI4th)— sign on courtroom
door—entry only to those with business before the court—
search for weapons—no violation of public trial**

A capital first-degree murder defendant's constitutional right
to a public trial was not violated where the trial court allowed the
bailiff to post a sign on the courtroom door advising members of
the public not to enter unless they had business in the court and

STATE v. LEMONS

[348 N.C. 335 (1998)]

stating that all who entered would be searched for weapons. The sign was an attempt to ensure the orderliness of the courtroom proceedings, even defense counsel was a proponent of the device, and it was not an order of closure. Defendant's family, the press, or others interested in observing the trial were not eliminated and defendant did not show that anyone was prevented from entering. Finally, under these facts, defendant cannot demand a new trial upon the assertion of an alleged violation of the constitutional rights of a third person. U.S. Const. amend. VI; N.C. Const. art. I, § 18.

4. **Evidence and Witnesses § 318 (NCI4th)— first-degree murder—subsequent assault—admissible—identity**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by admitting testimony concerning an assault ten days after the murders and related photographs where the murder victims were taken by surprise, confined in the trunk of a car, forced to strip and then were robbed and shot in the head, and the assault victim was also taken by surprise, assaulted, robbed, and shot in the back of the head using the same gun that killed one of the murder victims. The evidence was relevant to identity and the trial court gave a limiting instruction.

5. **Criminal Law § 45 (NCI4th Rev.)— first-degree murder— aiding and abetting—mere presence—friend exception**

The trial court did not err in a capital prosecution for first-degree murder by instructing the jury on the friend exception to the mere presence rule where the evidence showed that defendant and Leggett were first cousins and that defendant moved in with Leggett's family upon relocating to North Carolina; defendant met Teague while living with his cousin; defendant left a house on the night of the murder in a strange car which he knew had been stolen "from some crackheads"; defendant knew the victims were in the trunk and that Teague and Leggett were getting ready to rob some people; defendant went to his aunt's house with Leggett and Teague after the murders, where he lived until he was arrested; and Teague remained in contact with defendant and informed him when he sold one of the weapons used in the murders. The evidence was sufficient to support the inference that defendant, by his presence, communicated to Leggett and Teague his intent to render aid in the commission of the crime should it become necessary.

**6. Criminal Law § 461 (NCI4th Rev.)— capital murder—prosecutor's argument—deterrent effect**

The trial court did not abuse its discretion by failing to intervene *ex mero motu* in the prosecutor's argument in a first-degree murder prosecution where defendant contended that the prosecutor improperly argued the general deterrent effect of the death penalty, but the prosecutor focused on the gravity of the jury's duty and its responsibility to follow the law.

**7. Criminal Law § 444 (NCI4th Rev.)— first-degree murder—prosecutor's argument—defendant and defense witness as liars—no plain error**

The prosecutor's remarks in a capital first-degree murder prosecution were not so prejudicial and grossly improper as to require the trial court to intervene *ex mero motu* where defendant contended that the prosecutor referred to defendant and a defense witness as liars, but the prosecutor instead characterized portions of the testimony as inaccurate and untrue.

**8. Criminal Law § 447 (NCI4th Rev.)— first-degree murder—prosecutor's argument—defense expert**

The prosecutor's remarks disparaging defendant's expert witness in a capital first-degree murder prosecution were neither prejudicial nor grossly improper in light of the testimony concerning the restriction or suspension of the witness's license and where defense counsel herself asked the jury not to hold the witness against defendant.

**9. Criminal Law § 467 (NCI4th Rev.)— first-degree murder—prosecutor's argument—characterization of defendant's acts**

There was no gross impropriety requiring the trial court to intervene *ex mero motu* in a capital first-degree murder prosecution where defendant contended that the prosecutor argued, contrary to the evidence, that the female victim had been sexually assaulted, but the prosecutor's statement merely characterized the actions of defendant and his accomplices and did not imply that defendant or his accomplices actually sexually assaulted the victim. The characterization of the dehumanizing acts committed by defendant was supported by the facts.

**10. Criminal Law § 456 (NCI4th Rev.)— first-degree murder— prosecutor's argument—comparison to Holocaust—no plain error**

A prosecutor's argument in a first-degree murder prosecution comparing defendant to the Gestapo and his conduct with the Holocaust was extreme but, in context, did not require the trial court to intervene *ex mero motu*.

**11. Criminal Law § 807 (NCI4th Rev.)— first-degree murder— instructions—aiding and abetting**

There was no plain error in a capital first-degree murder prosecution in the trial court's instruction on aiding and abetting where the trial court adhered to the pattern jury instructions on aiding and abetting and never used the phrases at issue in the cases cited by defendant.

**12. Jury § 260 (NCI4th)— first-degree murder—jury selection—peremptory challenges—no racial discrimination**

The trial court did not err in a capital first-degree murder prosecution by permitting the State to exercise peremptory challenges in a racially discriminatory manner where the excusals were not racially motivated and were not clearly erroneous. HIV dementia was a possible issue in the case; one juror was excused due to her feelings and experience with psychology and with HIV, and the other because he had worked as a health-care technician at Cherry Hospital for seventeen years and felt that he would be inclined to accept the testimony of a psychiatrist.

**13. Criminal Law § 1335 (NCI4th Rev.)— capital sentencing— hearsay statements of accomplice admitted—no abuse of discretion**

The trial court did not abuse its discretion in a capital sentencing hearing by admitting the hearsay statements of an accomplice (Teague) where defendant's accomplices claimed their Fifth Amendment privilege and refused to testify, defendant was allowed to offer testimony from two inmates that one of the accomplices had said that defendant had not been the shooter, and the State offered in rebuttal statements from the accomplices to law enforcement officers that defendant had shot the victims. The State during sentencing must be permitted to present any competent, relevant evidence relating to defendant's character or record which substantially supports the imposition of the death penalty. Once defendant offered evidence in support of the (f)(4)

mitigating circumstance and the nonstatutory mitigating circumstance that he was not the actual shooter, the State was entitled to present evidence rebutting that claim.

**14. Criminal Law § 1346 (NCI4th Rev.)— capital sentencing— new evidence on intent—*Enmund* instruction refused**

The trial court did not err in a capital sentencing proceeding by refusing to instruct the jury on the *Enmund/Tison* requirements where defendant contended that there was new evidence introduced during sentencing that was relevant to defendant's intent to kill. The sole consideration at the separate sentencing hearing is the appropriate punishment and reconsideration of defendant's guilt is irrelevant. Furthermore, defendant could have presented this evidence during the guilt phase had he so chosen.

**15. Criminal Law § 1344 (NCI4th Rev.)— capital sentencing— instructions—*Enmund* instruction—not required**

The trial court did not err by refusing to instruct a capital sentencing jury on the *Enmund/Tison* requirements where the jury was instructed on the friend exception to the mere presence rule. The State's evidence demonstrated that defendant had the *mens rea* required for conviction based on malice, premeditation, and deliberation and, accordingly, no *Enmund/Tison* instruction was required.

**16. Criminal Law § 1388 (NCI4th Rev.)— capital sentencing—mitigating circumstances—impaired capacity—not submitted**

The trial court did not err in a capital sentencing proceeding by not submitting the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired where defendant testified that he was not doing drugs and that there was nothing wrong with his "ability to comprehend what's going on and understand," he further testified that there was nothing wrong with him on the night of the murders and that he knew these crimes were illegal, and an expert forensic psychiatrist testified that defendant knew the difference between right and wrong and that defendant had no confusion of thinking, no bipolar disorder, was in touch with reality, and was oriented to time, place, and circumstances. There was no testimony or evidence suggesting that defendant's capacity to understand right from wrong or

to conform his conduct to the law was impaired at the time of the murder.

### 17. Criminal Law § 1336 (NCI4th Rev.)— capital sentencing— evidence of several robberies—no prejudice

The trial court did not abuse its discretion in a capital sentencing proceeding by admitting evidence of several robberies where defendant attempted to introduce a statement by the cellmate of an accomplice to a detective with portions excluded; the court denied the motion to redact; defendant called the inmate to the witness stand and requested that he read to the jury the statement that he had given the detective; and the statement contained references to the robberies. There was no prejudice in the portion of the statement relating to one of the robberies because it was made clear to the jury that defendant had no part in that robbery, and the evidence of the other two robberies was relevant to the course of conduct aggravating circumstance.

### 18. Criminal Law § 1370 (NCI4th Rev.)— capital sentencing— aggravating circumstances—especially heinous, atrocious, and cruel

There was no plain error in a capital sentencing proceeding in the instruction on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel where defendant contended that the instruction given impermissibly allowed the jury to find the circumstance based on the intent and actions of defendant's accomplices, but, as in *State v. Syriani*, 333 N.C. 350, the instruction passes constitutional muster. Furthermore, the focus throughout sentencing was on the conduct of defendant rather than his accomplices and did not permit the jurors to find aggravating circumstances based on the actions of defendant's accomplices. The evidence showed that the victim was kidnapped, confined in the trunk of a car, and driven around while defendant and his accomplices contemplated her robbery; she was forced to strip naked in front of her kidnappers and was searched for money and drugs; and, after witnessing the murder of her companion, she was killed as she begged for her life. Furthermore, the jury failed during the sentencing proceeding to find the existence of the statutory mitigating circumstance that this murder was actually committed by another person and that defendant was only an accomplice.

STATE v. LEMONS

[348 N.C. 335 (1998)]

**19. Criminal Law § 1365 (NCI4th Rev.)— capital sentencing— aggravating circumstances—avoiding arrest or effecting escape**

The trial court did not err in a capital sentencing proceeding by submitting the aggravating circumstance as to one of two victims that the murder was committed for the purpose of avoiding or preventing a lawful arrest where defendant argued that there was evidence that his accomplices were motivated by this purpose, but no competent evidence that defendant was similarly motivated; however, defendant conceded at trial that this victim was killed to eliminate her as a witness. N.C.G.S. § 15A-2000(e)(4) speaks only of avoiding or preventing a lawful arrest; it need not be defendant's arrest.

**20. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A death sentence was not disproportionate where the evidence supports each aggravating circumstance found, the sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor, and this case is distinguishable from each of the seven cases in which a death sentence was found disproportionate. Although defendant's two accomplices both received life sentences and defendant argues that there is no clear evidence indicating that he was more culpable and that there is a possibility that he was less culpable than either of them, the jury could reasonably find that defendant's actions warranted the death penalty.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing sentences of death entered by Smith (W. Osmond, III), J., on 18 August 1995 in Superior Court, Wayne County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments for two counts each of first-degree kidnapping and robbery with a firearm was allowed 17 July 1997. Heard in the Supreme Court 11 March 1998.

*Michael F. Easley, Attorney General, by John G. Barnwell and Teresa L. Harris, Assistant Attorneys General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine C. Fodor, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

This case arises out of the shooting deaths of Margaret Strickland and Bobby Gene Stroud. On 5 July 1994, defendant was indicted for two counts of first-degree murder, two counts of first-degree kidnapping, two counts of armed robbery, and one count of conspiracy to commit armed robbery and murder. Prior to trial, the State took a voluntary dismissal of the conspiracy charge. Defendant was tried before a jury, and on 11 August 1995, the jury found defendant guilty of all remaining charges. Following a capital sentencing proceeding, based upon the jury's finding defendant guilty of both murders on the basis of premeditation and deliberation and the felony murder theory, the jury recommended sentences of death for each of the murder convictions. In accordance with the jury's recommendation, the trial court entered two sentences of death. The trial court additionally sentenced defendant to forty years' imprisonment for each of the first-degree kidnapping convictions and for each of the armed robbery convictions, to be served consecutively to each other and concurrently with the sentences of death.

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial, free from prejudicial error.

At trial, the State's evidence tended to show the following: On the night of 21 January 1994, defendant was playing cards with Edna Raynor at her house. While at Raynor's, defendant's cousin, James Leggett, phoned defendant and told him that he and Kwame Teague were on their way to pick defendant up. When they arrived, defendant got into the car with Leggett and Teague, and they drove off. According to defendant, when he asked where the car came from, Teague said to "ask the people in the back." When defendant asked "if there was someone in there," referring to the trunk, he heard a man moan.

The three men then proceeded to a field near Rollingwood subdivision in Wayne County. Upon reaching the field, the two victims, Strickland and Stroud, were ordered out of the trunk at gunpoint and forced to strip. Stroud was then shot three times with a .25-caliber pistol, and Strickland was shot three times with a .32-caliber pistol. Subsequently, Leggett, Teague, and defendant went to the home of Bernice Lemons, defendant's aunt, where they spent the night.

The next day, the bodies of the victims were discovered in a field near Rollingwood Drive. Bobby Ray Kelly, a special deputy for the Sheriff's Department, arrived at the scene within approximately twelve to fifteen minutes of being notified of a possible shooting. Once there, Deputy Kelly secured the area and waited for additional help.

Subsequently, the bodies were identified as those of Bobby Gene Stroud and Margaret Strickland. Dr. Debra Radish, an expert in the field of pathology, performed the autopsy on Stroud. Dr. Radish testified that there were three separate gunshot wounds to Stroud's body. In Dr. Radish's opinion, Stroud "most likely" died five to ten minutes after suffering from a gunshot wound that entered his body in the left anterior temple and exited on the right of the anterior or front midline. The wound track was "from left to right through the brain slightly upward from the front to the back of his head." In Dr. Radish's opinion, "the cause of death in this case was due to [a] gunshot wound of the head."

Dr. Karen Chancellor, also an expert in the field of forensic pathology, performed the autopsy on Strickland. Although Strickland was shot three times, the bullets inflicted four wounds because one of them entered through her right forearm and struck her in the chest. One gunshot wound was above Strickland's left ear. In Dr. Chancellor's opinion, the gun was held no farther than one or two inches from Strickland's head when this wound was inflicted. Dr. Chancellor concluded that Strickland died from the "gunshot wound to the head and to the chest."

Ten days after the murders, on 31 January 1994, defendant assaulted and shot James Taylor in Taylor's home. Taylor's wound, however, was not fatal. Ballistics tests established that the gun which was used in the Taylor assault was also used in the Strickland murder. On the same day as the Taylor assault, defendant was arrested.

After being informed of his *Miranda* rights, defendant made several statements to police. In his final statement, defendant told the police that he was at Edna Raynor's house when Leggett and Teague phoned and told him that they were on their way to pick him up. Defendant stated that once they arrived,

[he] asked where the car came from. Kwame said ask the people in the back. I turned around and said, yo, is someone in there. I heard a man moan. I said, man, you are bull shitting me. I said

what's up. Kwame said make sure your prints ain't in this car. I looked and Kwame and Larry both had on white rubber gloves. Kwame drove for a little ways and stopped in a field with hills of dirt and tall weed.

According to defendant, Kwame then got the victims out of the car and ordered them to undress. Defendant stated that

Kwame pulled the man's pants off. The man took his own shirt off. The woman had pulled off, pulled all her clothes off. She was squatted on the ground. The man was lying on his side. Kwame grabbed the man and said, I am fixing to do him. Kwame shot him in the back of the head more than once. The woman started screaming and started running. Larry shot up in the air and ran and caught the woman. Larry made her lie, correction, Larry made her lay on the ground. She sat on her butt. Kwame asked her if she knew him. She stuttered. She hesitated. Kwame said, do her, Larry. Do her. Larry shot her in the back of the head. She started treating [sic] to get up. Larry slung her on the ground and shot her again in the side of the head. He shot her again in the stomach. We got back in the car.

The defendant also presented evidence during the guilt phase. Denio Edwards, a friend of defendant's, testified that he was with defendant, Jerry Newsome, and others at James Taylor's house on 30 January 1994. He testified that he heard defendant say that he had "made a lick against two white people for several thousand dollars" but that he did not hear defendant say he had killed two white people. Defendant testified that on 21 January 1994, Edna Raynor took him to her house, where he played cards and had one mixed drink. Defendant's testimony concerning the events on the night of 21 January 1994 mirror his statement to law enforcement officers as set out above. Defendant admitted that he lied to law enforcement officers in his first statement when he said that he did not get into the car with Teague and Leggett. He also admitted that he tried to get Raynor to provide him with an alibi and that she refused. He denied, however, that he planned the kidnapping and robbery of Stroud and Strickland and asserted that the only person he shot was James Taylor.

During the sentencing phase, defendant presented several witnesses who testified regarding defendant's family background and upbringing. Defendant also presented the testimony of James Davis and Antoine Dixon. The trial court allowed their testimony after both

Leggett and Teague asserted their Fifth Amendment privilege against self-incrimination. Davis, Leggett's cellmate in the Wayne County jail, testified that Leggett told him that he, Teague, and defendant "robbed somebody in the woods." He also stated that Leggett told him that Teague shot the man and that Leggett shot the woman in the back of her head.

Dixon testified that during February and March 1994, he was in jail with Leggett. According to Dixon, Leggett said that during the robbery, defendant started "hitting the man with his fists." Dixon further testified that Leggett said that Teague shot the man, and then he, Leggett, shot the woman in the head twice.

In rebuttal, the State presented the testimony of Sergeant Ken Taylor. Taylor testified that in Leggett's first statement to the police, he denied any involvement in the kidnappings, robberies, and murders. In his second statement, Leggett admitted involvement but stated that it was defendant who had shot the gun. Detective George Raecher also testified concerning a statement that Teague made to the police. In the statement, Teague admitted involvement in the crimes but denied actually firing the gun. Instead, Teague claimed that defendant "shot the man while he was laying [sic] on the ground." Teague further stated that as he ran off, he heard several more shots.

## I.

On appeal, defendant first contends that his constitutional right to be present at every stage of his capital trial was violated. Specifically, defendant contends that this right was violated when (a) the jurors took their oath outside of defendant's presence, and (b) the clerk spoke with prospective jurors outside of defendant's presence. Defendant argues that these incidents violate the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. We do not agree.

The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution guarantee the right of a criminal defendant to be present at every critical stage of his trial. *State v. Buchanan*, 330 N.C. 202, 208, 410 S.E.2d 832, 836 (1991). Our Court has interpreted the North Carolina Constitution as guaranteeing the accused the right to be present at "all times during the trial when any-

thing is said or done which materially affects defendant as to the charge against him." *State v. Chapman,* 342 N.C. 330, 337-38, 464 S.E.2d 661, 665 (1995), *cert. denied,* 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996).

[1] First, we will address defendant's contention that the trial court violated his constitutional rights by failing to require that prospective jurors take their oath in defendant's presence. Defendant argues that "[t]he swearing in of prospective jurors is a critical part of the trial, which the defendant is constitutionally entitled to view."

In *State v. Workman,* 344 N.C. 482, 476 S.E.2d 301 (1996), this Court stated that "[d]efendant's right to be present at all stages of his trial does not include the right to be present during preliminary handling of the jury venires before defendant's own case has been called." *Id.* at 498, 476 S.E.2d at 309. This Court went on to state that

> [defendant] had no right to be present when prospective jurors were preliminarily sworn, oriented and qualified for jury service in general, without regard to any particular case or trial. Further, because defendant Workman's trial had not yet commenced, these "proceedings" could not have been conducted during a stage of defendant Workman's capital trial.

*Id.* at 498, 476 S.E.2d at 310.

Similarly, in the present case, defendant had no right to be present when the prospective jurors were preliminarily sworn in. The trial court's introduction of the parties and other remarks to the prospective jurors once they were brought into the courtroom demonstrate that the jurors had been preliminarily sworn, oriented, and qualified for jury service generally, without regard to any particular case or trial.

[2] Second, defendant contends that his constitutional right to be present was violated by the clerk's *ex parte* contact with jurors. Defendant argues that the selection of the jury is a stage of a capital trial at which defendant must be present. Defendant further argues that because there is no record of the content of the clerk's contact with the jurors, and in particular, nothing showing that the clerk's contact was limited to the juror questionnaire inquiry, the violation of defendant's right to be present cannot be held harmless.

In the present case, *voir dire* was conducted on an individualized basis. Prospective jurors awaiting questioning were located in a room

STATE v. LEMONS

[348 N.C. 335 (1998)]

outside the courtroom. During jury selection, defense counsel brought to the trial court's attention the fact that the clerk had entered the room where prospective jurors were gathered and communicated with them outside the presence of defendant. The following exchange took place between the trial court and defense counsel:

[DEFENSE COUNSEL]: Your Honor, we were just handed another questionnaire indicating—by the bailiff—that there was someone else who also had not filled out a jury questionnaire. I know [the district attorney] discussed it and had asked that you bring the jury back in and make inquiry if there was anyone else who hadn't filled out a questionnaire, to go ahead so we do not have that problem again. Apparently the clerk asked that question back there. I don't know if it was verified, I have no idea what was said. I would just like to make sure that we don't have any other communication that way again. And, of course, if there is a need to check again to see if there's anyone else who has not done a questionnaire.

THE COURT: I don't think the clerk's communication with the jury would be improper, in that the clerk is responsible for seeing that the jurors are assembled here or summoned to be here, so forth. And one of the requirements, as I understand, in this case, was that either an order or agreement that jury questionnaires would be submitted to jurors to be filled out [sic]. So it seems to me the clerk was just carrying out that duty. Now, if you have any evidence of other communication —

[DEFENSE COUNSEL]: I have no idea what was communicated, your Honor. All I know is I'm handed a questionnaire. And I'm not questioning the situation. I'm just saying it's not on the record. Everything is supposed to be on the record with this jury . . . . But in any event, I have no other evidence of anything else, your Honor.

In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), this Court addressed the issue of whether the trial court erred in ordering the bailiff to engage in unrecorded communications with prospective jurors. Defendant specifically complained of the trial court's instructing the bailiff to "have the jurors fill out the [jury *voir dire*] questionnaires and then duplicate them." *Id.* at 86, 446 S.E.2d at 551. Defendant also noted that the trial court instructed the bailiff to "put the jurors in the jury room on break" and to "have them to return back to the jury room."

*Id.* Further, defendant complained of the clerk's administrative duties of calling the jury roll and explaining to the jurors what time they needed to arrive at court. This Court noted that the challenged communications "were of an administrative nature and did not relate to the consideration of defendant's guilt or innocence" and concluded that defendant's presence would not have had a reasonably substantial relation to his opportunity to defend. *Id.*

The same can be said in the present case. In distributing and gathering the questionnaires, the clerk merely sought to carry out the administrative duties which the trial court had requested. As we stated in *Bacon*, "[d]efendant has failed to demonstrate how his presence would have been useful to his defense in these instances, and we thus conclude that no constitutional violation has occurred." *Id.* at 86, 446 S.E.2d at 551-52. For the same reason, we hold that there has been no violation of defendant's constitutional rights. Accordingly, this assignment of error is overruled.

## II.

[3] Next, defendant contends that the trial court violated the constitutional mandate that courts be open to the public. U.S. Const. amend. VI; N.C. Const. art. I, § 18. Specifically, defendant argues that the sign posted on the courtroom door advising members of the public not to enter unless they had business in the court violated his constitutional rights. We disagree.

In the present case, prior to the beginning of jury selection, the bailiff requested the permission of the trial court to post a sign on the entrance to the courtroom. The following exchange occurred with regard to the posting of the sign:

THE COURT: Mr. Hartzog, I believe you want to bring something to the Court's attention on the record?

THE BAILIFF: Yes sir. We got a brief notice, with the Court's permission, to put on the door the notice "do not enter courtroom unless you have business in here. All persons entering or opening courtroom doors will be searched for weapons." We've used a very similar notice in murder trials in the past, and they work very well.

THE COURT: And I believe you indicated to me counsel for the defendant, as well as the state, have viewed that sign?

THE BAILIFF: Yes, sir.

STATE v. LEMONS

[348 N.C. 335 (1998)]

THE COURT: Let me ask on the record, then. Does the defendant have any objection? Does the defendant consent to the posting of that sign?

[DEFENSE COUNSEL]: Your Honor, we don't have a problem to the posting, but we suggest it be posted at the other superior court door, as well. They'd be entering at both doors. Maybe that's the rule of the Court, in both superior courts. I would just contend that would be appropriate for both doors for this defendant.

THE COURT: And does the state consent to such sign?

[THE STATE]: I really don't care, your Honor. That's fine.

The North Carolina Constitution requires that "[a]ll courts shall be open." N.C. Const. art. I, § 18. Additionally, the Sixth Amendment to the United States Constitution mandates that "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. However, as the United States Supreme Court has noted, "[a]lthough the right of access to criminal trials is of constitutional stature, it is not absolute." *Globe Newspaper Co. v. Superior Ct. for Norfolk County*, 457 U.S. 596, 606, 73 L. Ed. 2d 248, 257 (1982). The United States Supreme Court has stated that a trial judge may "in the interest of the fair administration of justice, impose reasonable limitations on access to a trial." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18, 65 L. Ed. 2d 973, 992 n.18 (1980). The Supreme Court further noted that in determining whether such limitations are warranted, the focus should be on " 'whether that control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.' " *Id.* at 581-82, 65 L. Ed. 2d at 992 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574, 85 L. Ed. 1049, 1053 (1941)).

In *People v. Colon*, 71 N.Y.2d 410, 521 N.E.2d 1075, 526 N.Y.S.2d 932, *cert. denied*, 487 U.S. 1239, 101 L. Ed. 2d 943 (1988), the New York Court of Appeals succinctly discussed some of the limitations which may be placed on a defendant's right to a public trial. In *Colon*, the New York court stated that

[t]he right to a public trial has always been recognized as subject to the inherent power of trial courts to administer the activities of the courtroom; suitably within the trial court's discretion is the power to monitor admittance to the courtroom, as the circum-

STATE v. LEMONS

[348 N.C. 335 (1998)]

> stances require, in order to prevent overcrowding, to accommo-
> date limited seating capacity, to maintain sanitary or health con-
> ditions, and generally to preserve order and decorum in the
> courtroom.

*Id.* at 416, 521 N.E.2d at 1078, 526 N.Y.S.2d at 935. Further, it has been stated that "[w]e should not be hasty to reverse a trial judge's actions in establishing order in his courtroom, unless his actions are not designed to maintain dignity, order, and decorum, and instead deny or abridge unwarrantedly the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Commonwealth v. Berrigan,* 509 Pa. 118, 132, 501 A.2d 226, 234 (1985).

In North Carolina, the presiding judge is authorized to "impose reasonable limitations on access to the courtroom when necessary to ensure the orderliness of courtroom proceedings." N.C.G.S. § 15A-1034(a) (1997). It is apparent from the record that the posting of the sign was an attempt to ensure the orderliness of the courtroom proceedings. Even defense counsel was a proponent of this device. In fact, defense counsel requested that the sign be placed at each entrance to the courtroom. As this Court stated in *State v. Hutchins,* 303 N.C. 321, 279 S.E.2d 788 (1981), "[w]hile every reasonable presumption will be indulged against a waiver of fundamental constitutional rights by a defendant in a criminal prosecution, a defendant may waive the benefit of constitutional guarantees by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it." *Id.* at 341-42, 279 S.E.2d at 801 (citation omitted).

Further, in the present case, it is important to note that we are not dealing with an order of closure, but rather with the posting of a sign. This sign indicated that only persons having business in the courtroom were allowed to enter. However, this did not eliminate such persons as defendant's family, the press, or others interested in observing the trial. Defendant has failed to bring to our attention any person who was prevented from entering the courtroom. Further, notifying persons entering the courtroom that they will be "searched for weapons" is certainly a legitimate and permissible measure to maintain the orderliness of the courtroom. *See Brown v. Doe,* 2 F.3d 1236 (2d Cir. 1993) (holding that security measures taken at a state courthouse are so peculiarly within the purview and discretion of the state judiciary as to be beyond review on a habeas corpus petition

absent a strong showing that the measures taken were inherently prejudicial and that defendant suffered actual prejudice), *cert. denied,* 510 U.S. 1125, 127 L. Ed. 2d 403 (1994).

In support of his position, defendant cites to both *Globe Newspaper Co.,* 457 U.S. 596, 73 L. Ed. 2d 248, and *Richmond Newspapers, Inc.,* 448 U.S. 555, 65 L. Ed. 2d 973. However, these cases are not applicable to the present case. Both *Globe* and *Richmond* assert the public's right of access to criminal trials under the First and Fourteenth Amendments to the United States Constitution. As this Court noted in *State v. Burney,* 302 N.C. 529, 276 S.E.2d 693 (1981), "[d]efendant cannot demand a new trial upon the assertion of an alleged violation of the constitutional rights of a third person under these particular facts." *Id.* at 537, 276 S.E.2d at 698.

Accordingly, we hold that, under the facts and circumstances of this case, defendant's constitutional right to a public trial was not violated. This assignment of error is without merit.

## III.

[4] Next, defendant contends that the trial court erred by admitting evidence of an unrelated assault allegedly committed by defendant. Defendant argues that the State's reliance on this evidence "was so extensive and prejudicial that it rose to the level of a due process violation under the Fourteenth Amendment [to] the United States Constitution and Article I, §§ 19 and 23 of the North Carolina Constitution." Defendant contends that the use of this evidence entitles him to a new trial. We do not agree.

In the present case, the State attempted to consolidate the charges against defendant arising out of the Strickland/Stroud murders with the charges pending against defendant involving the assault of James Taylor. The trial court denied the State's motion to consolidate these charges. However, the trial court subsequently ruled that the evidence regarding the Taylor assault was admissible under Rule 404(b) for the purposes of showing identity, motive, and intent. Defendant concedes that some limited evidence about the assault was admissible under Rule 404(b) because "it tended to show that the defendant had possession of one of the guns used in the charged crimes ten days after the homicides." However, defendant maintains that many of the details admitted into evidence "were entirely unrelated to this purpose and should have been excluded under Rule

404(b)." Specifically, defendant contends that the trial court erred by admitting (1) Taylor's testimony regarding the assault, (2) the testimony of three law enforcement officers concerning the investigation of the Taylor incident, and (3) eight photographs of Taylor's injuries and the crime scene.

The admissibility of specific acts of misconduct by the defendant is governed by Rule 404(b), which provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1992). Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

In order for evidence of defendant's prior crimes or bad acts to be admissible under Rule 404(b) to show identity of the perpetrator in the crime charged, there must be " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.' " *State v. Riddick*, 316 N.C. 127, 133, 340 S.E.2d 422, 426 (1986) (quoting *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983)). In the present case, the evidence shows that both of the victims were taken by surprise, confined in the trunk of the car, and forced to strip. They were then robbed, and each of them was shot in the head. James Taylor was also taken by surprise, assaulted, and robbed. More importantly, Taylor was shot in the back of the head using the same gun that killed Margaret Strickland. Here, because the evidence was relevant to show identity, it was properly admitted.

The crux of defendant's argument appears to be that even if admissible under Rule 404(b), evidence of the prior assault should have been excluded under Rule 403 of the North Carolina Rules of Evidence. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). However, the exclusion of the evidence under Rule 403 is a matter generally left to the sound discretion of the trial court. *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Abuse will be found only where the trial court's ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *Id.*

Here, the trial court did not abuse its discretion by admitting evidence of misconduct otherwise admissible under Rule 404(b). In fact, the trial court guarded against the possibility of prejudice to defendant by providing the jury with the following limiting instruction before Taylor's testimony regarding the alleged assault:

> Members of the jury, I am reminding you again, consistent with what I told you about earlier, let me instruct you that evidence of other crimes, wrongs, acts or conduct of the defendant regarding any alleged assault or robbery of James Taylor is not offered [or] admissible to prove the character of the defendant in order to show that he acted in conformity therewith with reference to these charges for which he is now being tried and must not be considered by you as such. It is offered and admitted for other purposes such as proof of motive, intent and identification of the defendant and may be considered by you for such other purposes, if you so find.

We hold that the trial court did not abuse its discretion by admitting the testimony concerning Taylor's assault and the photographs related to the assault. This assignment of error is overruled.

## IV.

[5] Next, defendant contends that the trial court erred by instructing the jury on the "friend" exception to the "mere presence" rule. Defendant argues that the instruction was erroneous because there was insufficient evidence to support the conclusion that defendant's presence would have encouraged or aided the two others involved in the criminal enterprise. We disagree.

Over defendant's objection, the trial court instructed the jury on aiding and abetting, including the "friend" exception to the "mere presence" rule, as follows:

> As to each charge of murder I now charge that for you to find the defendant guilty of first degree murder because of aiding and

abetting, the State must prove three things beyond a reasonable doubt.

First, that the crime of first degree murder was committed by some other person or persons. You will recall my prior charge to you as to the elements of first degree murder as they relate to this case both on the basis of malice, premeditation and deliberation and under the first degree felony murder rule in the perpetration of robbery with a firearm.

Second, that the defendant knowingly advised, instigated, encouraged, procured, and or aided the other person or persons to commit that crime. However, a person's not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission. *If the bystander is a friend of the perpetrator and knows his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement and in contemplation of the law, this would be aiding and abetting. To be guilty he must aid or actively encourage the person or persons committing the crime or in some way communicate to this person or persons his intention to assist in its commission.*

And, third, that the defendant's actions or statements caused or contributed to the commission of the crime of first degree murder by that other person.

(Emphasis added.)

In *State v. Rankin*, 284 N.C. 219, 200 S.E.2d 182 (1973), this Court discussed the "friend" exception to the "mere presence" rule and stated:

The mere presence of the defendant at the scene of a crime, even though he is in sympathy with the criminal act and does nothing to prevent its commission, does not make him guilty of the offense. To sustain a conviction of the defendant, . . . the State's evidence must be sufficient to support a finding that the defendant was present, actually or constructively, with the intent to aid the perpetrator in the commission of the offense should his assistance become necessary and that such intent was communicated to the actual perpetrator. Such communication of intent to aid, if needed, does not, however, have to be shown by express words of the defendant, but may be inferred from his actions and

from his relation to the actual perpetrator. "When the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement." Wharton, Criminal Law, 12th Ed., § 246.

*Rankin,* 284 N.C. at 223, 200 S.E.2d at 184-85 (citations omitted).

Applying these principles to the evidence in the present case, we find no error in the trial court's decision to instruct the jury on the "friend" exception to the "mere presence" rule. Here, the evidence showed that defendant and Leggett were first cousins and that he moved in with Leggett's family upon relocating to North Carolina. Further, while living with his cousin, he met Teague. According to defendant's own testimony, on the night of the murder, he left Raynor's house in a strange car which he knew had been stolen "from some crack heads." He testified that he knew the victims were in the trunk and that Teague and Leggett were "getting ready to rob some people." After the murders, he went to his aunt's house with Leggett and Teague, where he continued to live until he was arrested. According to defendant's own testimony, Teague stayed in contact with him after the murders and informed defendant when he sold one of the weapons used in the Strickland/Stroud murders. This evidence is sufficient to support an inference that defendant, by his presence, communicated to Leggett and Teague his intent to render aid in the commission of the crime should it become necessary. *See Rankin,* 284 N.C. 219, 200 S.E.2d 182.

### V.

Defendant also contends that the trial court erred by permitting the State to engage in grossly improper arguments during both the guilt phase and sentencing proceeding. Defendant argues that the improper arguments denied defendant his constitutional rights to due process and to a fair and reliable sentencing proceeding. We do not agree.

Arguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases. *State v. Williams,* 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Further, the remarks are to be viewed in the context in which they are made and the overall factual circumstances to which they refer. *State v. Womble,* 343 N.C. 667, 692-93, 473 S.E.2d 291, 306 (1996), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 719

(1997). Where, as here, defendant failed to object to the arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. To establish such an abuse, defendant must show the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair. *State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

[6] First, defendant contends that the prosecutor improperly argued the general deterrent effect of the death penalty to the sentencing jury. Specifically, the prosecutor's argument proceeded as follows:

> You know that crime is rampant in our society today and where in any society there is a lack of discipline and restraint in the conduct among its members there is a breakdown to due administration of law and order and the people are at risk. When members of society don't show the proper respect and restraint and discipline then they encourage crime because the attitude of the people affects the feelings of its members that say why not do a certain act. I will get away with it or if caught I can afford the consequences. The attitude of my people in my community or in my nation and my state will not make the consequences too grave. Remember the old ditty that we often jokingly say to one another. If you can't do the time, don't do the crime. As jurors you should seriously consider your obligation pursuant to your oath to do something about violent crime in your community and you do that by fairly and impartially applying the law to the facts and returning the proper verdict regardless of the consequences. It is your responsibility to fairly and objectively assess what this defendant deserves under the law for his lack of restraint.

In *State v. Barrett*, 343 N.C. 164, 469 S.E.2d 888, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 259 (1996), the prosecutor made the following argument:

> Many times you hear about events like this, shootings, murders and you say, well somebody ought to do something about that. Well, ladies and gentlemen, you are that somebody that everybody talks about. Today you speak for the people of Northampton County. You are Northampton County. Today you send a message, a thunderous message, to those who would even think of coming to this county and committing acts like the

defendant and his friends did on August the 6th, 1989. The buck stops here, ladies and gentlemen, and you cannot pass it along. It's in your laps. The police can't do anymore, the Judge can do no more. It's up to you to decide.

*Id.* at 180, 469 S.E.2d at 897-98. This Court, in holding that the argument was not grossly improper, noted that the prosecutor "was commenting on the seriousness of the crime and the importance of the jury's duty. We have previously held that the prosecutor is allowed to argue the seriousness of the crime." *Id.* Similarly, in the present case, the prosecutor focused on the gravity of the jury's duty and its responsibility to follow the law. Thus, the trial court did not abuse its discretion by failing to intervene *ex mero motu.*

**[7]** Next, defendant contends that the prosecutor improperly repeatedly referred to defendant and a defense witness as "liars." However, the prosecutor did not refer to these witnesses as liars, but rather characterized portions of their testimony as being inaccurate and untrue. On the witness stand, defendant acknowledged telling numerous lies to mislead authorities, including lies intended to inculpate Teague and exculpate himself. Upon cross-examination by the prosecutor, defendant acknowledged lying to the police, his aunt, and his grandmother. The prosecutor's remarks were directed at the credibility of defendant in light of the evidence presented. The prosecutor's comments do not equate to the type of specific, objectionable language that would require the trial court to intervene *ex mero motu. See, e.g., State v. Locklear,* 294 N.C. 210, 214-18, 241 S.E.2d 65, 68-70 (1978) (prosecutor asserted defendant was "lying through [his] teeth" and "playing with a perjury count"); *State v. Miller,* 271 N.C. 646, 657-59, 157 S.E.2d 335, 344-45 (1967) (prosecutor stated that he knew defendant "was lying the minute he said that" and referred to defendant as "habitual storebreaker" when nothing in the record supported such reference). Rather, the prosecutor's argument was "no more than an argument that the jury should reject the defendant's testimony" because "[defendant's] version of the events [was] unbelievable." *State v. Solomon,* 340 N.C. 212, 220, 456 S.E.2d 778, 784, *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 438 (1995). Accordingly, these remarks were not "so prejudicial and grossly improper as to require corrective action by the trial court *ex mero motu." State v. James,* 322 N.C. 320, 324, 367 S.E.2d 669, 672 (1988).

**[8]** Likewise, the prosecutor's remarks disparaging defendant's expert witness, Dr. Brown, were neither prejudicial nor grossly

improper. In fact, defense counsel, herself, made the following state-
ment to the jury:

> Now I have to claim responsibility for Dr. Brown. Edward
> Lemons [defendant] didn't hire him. . . . I apologize to this
> jury but you determine if at all his testimony has any weight for
> you. . . . The Court finds him as an expert but I submit to you
> please don't hold the credentials or lack thereof or the attitude or
> whatever you would determine Dr. Tom Brown to have against
> Edward Lemons.

Having reviewed the prosecutor's remarks, we conclude that they
were neither prejudicial nor grossly improper. This is especially true
in light of the testimony concerning the restriction or suspension of
Dr. Brown's license.

[9] Defendant also contends that the prosecutor improperly argued,
contrary to the evidence, that the female victim, Margaret Strickland,
had been sexually assaulted. However, a review of the record fails to
reveal any argument by the prosecutor that the victim was sexually
assaulted. Rather, the prosecutor argued as follows:

> I would like for you to consider for yourselves what human being,
> male or female, would enjoy the abuse that these young men
> heaped upon their heads for their own, and I would submit to you
> in effect, sexual satisfaction before the ultimate moment of
> death. The climax of the escapade.

This statement merely characterizes the actions of defendant and his
accomplices. It does not imply that defendant or his accomplices
actually sexually assaulted the victim. The fact that Strickland was
forced to strip herself, or was stripped naked, at gunpoint and then
shot supports the prosecutor's characterization of the dehumanizing
acts committed by defendant and his accomplices.

[10] Finally, defendant contends that the prosecutor improperly
compared defendant to the Gestapo and equated his conduct with the
Holocaust. During the guilt phase of the trial, the prosecutor argued
that

> those who agree and unite together are responsible for whatever
> any one of them does. Illogical extreme and I don't want you to, I
> don't want, I'm using this as an illustration only and don't take it
> any further. The logical extreme is the Nuremberg trials. We
> brought Germany to task. The allies did and tried their leaders

and one whole organization on this theory of crime against humans and adjudicated the SSI. Do you know who I am talking about? The whole group, the Gestapo, those who wore the black shirts whether they were at the camps, whether they were on the front lines in Russia, whether they opposed our men at Normandy, we adjudicated them all guilty of belonging to a criminal organization because they were an instrumentality of a Natzi [sic] state, a co-conspiracy against humans. That's that. You combine together for a criminal purpose and a criminal act, everybody who agrees is guilty of the conspiracy and if they are present and it takes place in their presence and they encourage or they give assistance or anything like that then they are responsible for the substantive crime of murder.

Later, the prosecutor once again compared defendant's conduct to the Holocaust by stating: "The attitude of the defendant toward the victims on the stand, you remember, and toward others, the choice of language, the attitude about people. We lost eight million people on the face of this earth for that same attitude."

Although the prosecutor's comparison was extreme, we do not believe that it required the trial court to intervene *ex mero motu*. The prosecutor was quick to put the comparison in perspective by stressing to the jury that it was merely "an illustration." In fact, the prosecutor himself characterized the comparison as "illogical extreme." Thus, when taken in context, the argument was not so grossly improper as to require the trial court to intervene *ex mero motu*. Accordingly, this assignment of error is without merit.

## VI.

[11] In his next assignment of error, defendant contends that the instructions on aiding and abetting constitute error because they did not require the jury to find that defendant had the requisite *mens rea* to commit premeditated and deliberate first-degree murder. Defendant argues that the instructions fail to require the jury to find an essential element of first-degree murder, thereby violating his due process rights. We disagree.

Defendant concedes that he did not object to the form of the instruction at trial. Accordingly, defendant must show plain error. "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error

would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 132 (1998).

The instructions to which defendant objects are set out above in Issue IV. In support of his contention, defendant cites *State v. Allen*, 339 N.C. 545, 453 S.E.2d 150 (1995), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997). However, *Allen* is distinguishable from the present case. In *Allen*, this Court concluded that the phrases "should have known" or had "reasonable grounds to believe" did not "convey the concept of specific intent necessary for aiding and abetting a first-degree murder committed with premeditation and deliberation." *Id.* at 558, 453 S.E.2d at 157. However, construing the instructions contextually, this Court found no plain error. Rather, the Court held that the instructions conveyed the essential principle that the defendant knowingly aided the perpetrator in committing the crime.

In the present case, the trial court adhered to the pattern jury instructions on aiding and abetting. The trial court never used the phrases "should have known" or had "reasonable grounds to believe." Accordingly, we hold that the trial court did not commit error, much less plain error, in giving the instructions of which defendant now complains. This assignment of error is without merit.

## VII.

[12] Next, defendant contends that the trial court erred by permitting the State to exercise peremptory challenges in a racially discriminatory manner. Defendant argues that the trial court's ruling deprived him of his constitutional right to be tried by a jury selected without regard to race or gender. We do not agree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit a prosecutor from peremptorily excusing a prospective juror solely on the basis of his or her race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); *State v. Floyd*, 343 N.C. 101, 106, 468 S.E.2d 46, 50, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 170 (1996). A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, defendant must establish a *prima*

*facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a race-neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

In the present case, the prosecutor volunteered his explanations, and the trial court ruled that there was no purposeful discrimination. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405. Thus, the only issue for us to determine is whether the trial court correctly concluded that the prosecutor had not intentionally discriminated. *State v. Thomas*, 329 N.C. 423, 430-31, 407 S.E.2d 141, 147 (1991). Because the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412.

Applying these principles, we now examine the prosecutor's reasons for peremptorily challenging the prospective jurors. First, defendant contends Mary Jones, a black female, was improperly struck for racial reasons. At trial, the prosecutor offered the following reasons for exercising this peremptory challenge:

> Her study of psychology and how she feels about psychology, and how she says that her experience with psychology would bear in the trial of this case with the psychiatrist. Also, her experience with HIV, talking with—in her classes and people who have [] HIV, telling them how it affects them, the symptoms that they have. And I'm sure, according to their doctor his report would indicate that one of the issues in this case is whether, as a result of HIV, this young man has dementia. They've already said that in their report. So there's a factual connection and nexus with this case. And we just feel like that we would like to challenge for that.

Second, defendant contends that the prosecutor committed purposeful discrimination when the prosecutor exercised a peremptory challenge on Reynolds Lewis, a black male prospective juror. During *voir dire*, Lewis testified that he had worked as a health-care technician at Cherry Hospital for seventeen years. When the prosecutor asked whether he would believe the testimony of a psychiatrist,

Lewis replied that he "would have no choice but to accept his testimony, because he's supposed to know what he's doing." The prosecutor pursued this line of questioning as follows:

Q. And if he said one thing, then you would be inclined to accept that, and that would affect your verdict; is that correct?

A. Yes.

Q. And you would not be inclined to look at his testimony and to decide—and to say, "well, you know, I just don't believe what he's saying is right." You would not be inclined to do that?

A. No, I would not.

Q. Are you firm in that belief, sir?

A. I am firm.

We hold that the trial court properly overruled defendant's objection to the prosecutor's use of the peremptory challenges to excuse each of these jurors. "Taken singly or in combination, the State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during *voir dire*." *State v. Robinson*, 336 N.C. 78, 99, 443 S.E.2d 306, 315 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). Thus, the excusals of the prospective jurors, as discussed above, were not racially motivated and are not clearly erroneous. Accordingly, this assignment of error is overruled.

## VIII.

[13] Next, defendant contends that the trial court erred by admitting the statements of accomplice Kwame Teague during the sentencing proceeding. Defendant argues that the confessions were inadmissible both substantively and for impeachment purposes. We disagree.

On 7 July 1995, defense counsel filed a notice of intent, "in the event that the co-defendants in this case, Kwame Teague and Larry Leggett, take the 5th Amendment," to introduce hearsay evidence through James Davis, Antoine Dixon, and Leshuan Lathan. The State responded with a notice of intent to introduce hearsay testimony in the form of statements of codefendants Larry Leggett and Kwame Teague if the trial court allowed the hearsay evidence proffered by the defense.

**STATE v. LEMONS**

[348 N.C. 335 (1998)]

After extensive *voir dire*, the trial court ruled that defendant could offer the hearsay evidence of Antoine Dixon and James Davis. The trial court concluded that defendant's evidence was relevant to the issue of mitigation of defendant's punishment. The trial court also noted the State's notice of intent and indicated that it would be allowed to proceed "if the evidence so shows and so supports it."

Subsequently, defendant called both Leggett and Teague to the stand. Each, respectively, claimed his Fifth Amendment privilege against self-incrimination. Defendant then offered the testimony of both Dixon and Davis in support of the (f)(4) statutory mitigating circumstance that "[t]he defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor," N.C.G.S. § 15A-2000(f)(4) (1997), and the nonstatutory mitigating circumstance that "defendant was not the actual shooter of Margaret Strickland or Bobby Gene Stroud."

Subsequently, both Dixon and Davis were called to the stand. Dixon testified that Leggett stated that he (Leggett), Teague, and defendant were involved in the Strickland/Stroud crimes. Dixon further testified that Leggett told him that Teague shot the man and that Leggett shot the woman. Following Dixon's testimony, Davis also testified that Leggett told him that Teague shot the man and that Leggett shot the woman.

In rebuttal, the State offered two statements that Leggett made to law enforcement officers and two statements that Teague made to law enforcement officers. The confessions of both men allege that defendant personally shot the victims. While defendant concedes that Leggett's confessions to the police are admissible as prior inconsistent statements of a hearsay declarant, defendant argues that Teague's confessions were inadmissible because they are unreliable and are not inconsistent with Teague's own hearsay declaration that he planned to "put [the crimes] on Ed [defendant]."

Teague, in his first statement to police, denied any knowledge of or involvement in the crimes. However, the next morning, he implicated himself in the kidnapping and robberies, but claimed that defendant shot the man and that, at that point, Teague ran off and then he heard several more shots.

During the sentencing proceeding, the State "must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposi-

tion of the death penalty." *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Further, "[t]he State may offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence." *State v. Heatwole*, 344 N.C. 1, 21, 473 S.E.2d 310, 320 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 339 (1997).

Here, once defendant offered evidence in support of the (f)(4) statutory mitigating circumstance and a nonstatutory mitigating circumstance that defendant was not the actual shooter, the State was entitled to present evidence rebutting this claim. Accordingly, the trial court did not abuse its discretion by admitting the statements of Teague. This assignment of error is without merit.

## IX.

[14] Next, defendant contends that the trial court erred by failing to instruct the jury in accordance with the requirements of *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127 (1987). Defendant argues that new evidence was introduced during the sentencing proceeding which corroborated defendant's contention that he was a passive participant in the murders. Because of this new evidence, defendant contends that an instruction on the *Enmund/Tison* issue was constitutionally required. We disagree.

In *Enmund*, the United States Supreme Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Enmund*, 458 U.S. at 797, 73 L. Ed. 2d at 1151. In *Tison*, the Court expanded on the *Enmund* holding and stated that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Tison*, 481 U.S. at 158, 95 L. Ed. 2d at 145.

Defendant notes that our pattern jury instructions contain an instruction which reflects the requirements of *Enmund* and *Tison*. If there is evidence suggesting that defendant was not personally involved in the killing, the following instruction is to be given:

STATE v. LEMONS

[348 N.C. 335 (1998)]

First, [the jury must unanimously find beyond a reasonable doubt] that the defendant himself:

(a) Killed or attempted to kill the victim; or

(b) Intended to kill the victim; or

(c) Intended that deadly force would be used in the course of the felony; or

(d) Was a major participant in the underlying felony and exhibited reckless indifference to human life.

N.C.P.I.—Crim. 150.10 (1997). Thus, before the death penalty can be considered, the jury must make an initial determination regarding the defendant's culpability.

In his brief, defendant concedes that this instruction is not required where the defendant has been found guilty of premeditated and deliberate murder. *See State v. Robinson*, 342 N.C. 74, 88, 463 S.E.2d 218, 226 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996). Defendant notes that "[t]he rationale behind the rule in *Robinson* is that a finding of specific intent to kill at [the] guilt phase 'carries over' to sentencing." However, defendant contends that this rationale does not apply to the facts of this case because of new evidence introduced during sentencing that was relevant to the question of defendant's intent to kill. The new evidence to which defendant refers is the confessions that accomplice Larry Leggett made to two cellmates.

In *State v. Walls*, 342 N.C. 1, 463 S.E.2d 738 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996), this Court stated as follows:

Once the jury determines at trial, as it did here, that defendant is guilty of murder in the first degree, the sole remaining consideration, at the "separate sentencing proceeding," N.C.G.S. § 15A-2000(a)(1), is the appropriate punishment, focusing on the defendant's character or record and any of the circumstances of the offense. As stated, we do not agree that residual doubt testimony is admissible during the sentencing proceeding of a capital case.

*Walls*, 342 N.C. at 52-53, 463 S.E.2d at 765-66. Thus, reconsideration of defendant's guilt is irrelevant in determining his appropriate sentence. Further, defendant could have presented the confessions of Leggett during the guilt phase if he had so chosen.

**[15]** Defendant also contends that because the jury was instructed on the "friend" exception to the "mere presence" rule, defendant was entitled to an *Enmund/Tison* instruction. However, as noted above, the State's evidence demonstrated that defendant had the *mens rea* required for conviction of first-degree murder based on malice, premeditation, and deliberation. Accordingly, no *Enmund/Tison* instruction was required. Based on our analysis above, we hold that the trial court did not err by refusing to instruct the jury on the *Enmund/Tison* requirements. Accordingly, this assignment of error is without merit.

## X.

**[16]** Defendant also assigns as error the trial court's failure to submit the (f)(6) mitigating circumstance that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law was impaired." N.C.G.S. § 15A-2000(f)(6). Defendant argues that evidence was introduced during the sentencing proceeding to support the (f)(6) mitigating circumstance and that the trial court's refusal to submit it violated his constitutional rights.

"A trial court must submit only those mitigating circumstances which are supported by substantial evidence." *State v. Strickland*, 346 N.C. 443, 463, 488 S.E.2d 194, 206 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 757 (1998). Further, "defendant bears the burden of producing 'substantial evidence' tending to show the existence of a mitigating circumstance before that circumstance will be submitted to the jury." *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). This Court has noted that the (f)(6) statutory mitigating circumstance

> has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions.

*Syriani*, 333 N.C. at 395, 428 S.E.2d at 142-43.

Here, the record does not support submission of the (f)(6) statutory mitigating circumstance. Defendant himself testified that he was not "doing drugs" while living with his aunt and that there was nothing wrong with his "ability to comprehend what's going on and under-

stand." He further testified that there was nothing wrong with him the night of the murders and that he knew that armed robbery, kidnapping, and murder were illegal. Additionally, Dr. Thomas Brown, an expert in the field of forensic psychiatry, testified that, in his opinion, defendant knew the difference between right and wrong on the night of the murders. He further testified that defendant had no "confusion of thinking"; had no bipolar disorder; was in touch with reality; and was oriented to time, place, and circumstances.

Further, there was no testimony or evidence suggesting that at the time of the murder, defendant's capacity to understand right from wrong or to conform his conduct to the requirements of the law was impaired as required by the (f)(6) mitigator. Thus, the trial court did not err by refusing to submit this mitigating circumstance to the jury. Accordingly, this assignment of error is without merit.

## XI.

[17] Next, defendant contends that the trial court committed constitutional error by admitting evidence during the sentencing proceeding regarding several unrelated robberies. Defendant argues that the testimony that was admitted was unreliable and unrelated to any aggravating circumstance. We do not agree.

During the sentencing proceeding, defendant sought to introduce declarations made by his accomplices, Leggett and Teague, to their cellmates, James Earl Davis and Antoine Dixon. As noted above, the trial court subsequently ruled that these statements were admissible. The trial court specifically found that Leggett's statements to Dixon were "made under and with corroborating circumstances to clearly indicate the trustworthiness of the statements so as to render it admissible at this sentencing hearing" as evidence in mitigation to the issue of punishment.

Defendant also proffered a statement by Dixon to Detective George Raecher regarding what Leggett had told him. In that statement, among other things, Dixon described Leggett's statements concerning three robberies unrelated to the murders of Strickland and Stroud. However, defendant made a motion to exclude certain portions of the statement, including the statements relating to the robberies mentioned above. The State then argued that once a statement is admitted into evidence, the law requires that the entire statement be admitted. The State further argued that the evidence concerning the other robberies was relevant to prove the "course of conduct"

aggravating circumstance. Subsequently, the trial court denied defendant's motion to redact certain portions of the statements.

Defense counsel then called Dixon to the witness stand and requested that he read to the jury the statement that he gave to Detective Raecher. Contained within this statement were references to "Katlyn's" robbery; another robbery involving Leggett, Teague, and defendant; and a robbery of a man who was walking down a street. Dixon testified in part as follows:

> Larry also talked about the Katlyn's robbery. He said that himself, his brother [James Leggett], Dontai, Kwame and John Edwards were with him . . . . He said they went in the back door. Jay Leggett stayed outside. Kwame [Teague], John Edwards and Larry went into the restaurant. He said they knew there was a lot of money there.
>
> . . . .
>
> Larry told me about the other two robberies he was charged with. He said Kwame and Edward [defendant] were with him. They ran into a house and made everyone lay down [sic]. He said they got a lot of money. He said they robbed a white man walking down Center Street.

Defendant now contends that the statement contained the following inadmissible testimony: (1) the robbery of Katlyn's restaurant in which defendant was not involved, and (2) testimony involving other unrelated robberies in which defendant may have been involved.

"Although the Rules of Evidence do not apply in sentencing proceedings, they may be helpful as a guide to reliability and relevance." *State v. Bond*, 345 N.C. 1, 31, 478 S.E.2d 163, 179 (1996), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997). Any evidence the court "deems relevant to sentence" may be introduced at this stage. N.C.G.S. § 15A-2000(a)(3). The State "must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty." *Brown*, 315 N.C. at 61, 337 S.E.2d at 824.

Here, the State contends that the evidence was relevant to support the "course of conduct" aggravating circumstance. "In determining whether the evidence tends to show that another crime and the crime for which defendant is being sentenced were part of a course

of conduct, the trial court must consider a number of factors, including the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons." *State v. Cummings*, 346 N.C. 291, 329, 488 S.E.2d 550, 572 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 873 (1998).

First, we will address the portion of the statement relating to the robbery at Katlyn's. While this evidence does not appear to be relevant to defendant's character or record, defendant can show no prejudice in its admission. In a stipulation admitted into evidence, it was made clear to the jury that defendant had no part in this robbery. Specifically, the stipulation provided that "the robbery at Katlyn's occurred June 7, 1993 which was prior to the defendant coming to the State of North Carolina." Also, while questioning Dixon regarding this robbery, the prosecutor specifically pointed out that Leggett had told Dixon that defendant was not with them at that time. Indeed, as set out above, Dixon listed five individuals who took part in the Katlyn robbery, none of whom was defendant.

As to the statements regarding the other two robberies, we hold that the trial court did not abuse its discretion in admitting them because the evidence was relevant to the "course of conduct" aggravating circumstance. While the jury did not hear evidence of the exact date of the robberies, it could logically infer that the two robberies occurred between 4 or 5 January 1994 and 31 January 1994. According to Dixon's statement, Leggett, Teague, and defendant all participated in the robberies. The record establishes that defendant did not meet Teague until 4 or 5 January 1994. The murders of Strickland and Stroud were committed on 21 January 1994. Defendant was arrested on 31 January 1994. Thus, from the evidence presented, the jury was aware the robberies occurred in a period that was no more than seventeen days before the murders and no more than ten days after the murders. Further, the *modus operandi* was sufficiently similar. The evidence presented showed that defendant, Leggett, and Teague acted together in each crime and relied on the element of surprise. The trial court did not abuse its discretion in admitting the portions of the statement involving the two robberies. Accordingly, this assignment of error is overruled.

## XII.

[18] Defendant also contends that the trial court's instructions on the (e)(9) aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9), were uncon-

stitutionally vague. Defendant argues that the trial court's instructions impermissibly allowed the jury to find this circumstance based upon the actions of defendant's accomplices. Thus, defendant contends he is entitled to a new sentencing hearing. We disagree.

During the sentencing proceeding, the State sought submission in the Strickland case of the statutory aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." Defendant objected to submission of this aggravating circumstance on the grounds that the evidence did not support it. However, as defendant concedes in his brief, he did not request a limiting instruction on this circumstance. For the first time, on appeal, defendant contends that the instructions given on this circumstance are unconstitutionally vague. Accordingly, appellate review of this argument may be sought only under the plain error standard. *See State v. Frye,* 341 N.C. 470, 495-96, 461 S.E.2d 664, 676-77 (1995), *cert. denied,* 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

As previously noted, "the term 'plain error' does not simply mean obvious or apparent error." *State v. Collins,* 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *Holden,* 346 N.C. at 435, 488 S.E.2d at 531. We conclude that the trial court's instructions on the (e)(9) aggravating circumstance did not constitute error, much less plain error.

In the present case, the trial court instructed the jury on the (e)(9) aggravating circumstance as follows:

Fourth, was this murder of Margaret D. Strickland especially heinous, atrocious or cruel?

In this context heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. And cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. However, it is not enough that this murder be heinous, atrocious or cruel, as those terms have just been defined, this murder must have been especially heinous, atrocious or cruel and not every murder is especially so. For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing

or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

In *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, this Court upheld instructions identical to those set out above. In upholding the instructions, this Court stated that "[b]ecause these jury instructions incorporate narrowing definitions adopted by this Court and expressly approved by the United States Supreme Court, or are of the tenor of the definitions approved, we reaffirm that these instructions provide constitutionally sufficient guidance to the jury." *Id.* at 391-92, 428 S.E.2d at 141.

Nevertheless, defendant contends that these instructions impermissibly allow the jury to find this circumstance based on the intent and actions of defendant's accomplices and that the instruction is therefore unconstitutionally vague. However, this argument is meritless. As noted in *Syriani*, the instruction given passes constitutional muster. Further, the focus throughout sentencing was on the conduct of defendant, not his accomplices, and did not permit the jurors to find aggravating circumstances based on the actions of defendant's accomplices.

Here, the evidence showed that Strickland was kidnapped, confined in the trunk of a car, and driven around while defendant and his accomplices contemplated her robbery. She was then forced to strip naked in front of her kidnappers and was searched for money and drugs. Finally, after witnessing the murder of her companion, she was killed as she begged for her life. This evidence certainly supports submission of the (e)(9) aggravating circumstance. Further, the jury failed during the sentencing proceeding to find the existence of the statutory mitigating circumstance that the "murder of Margaret Strickland was actually committed by another person and the defendant was only an accomplice in/or an accessory to the murder and his participation in the murder was relatively minor." N.C.G.S. § 15A-2000(f)(4). Thus, it is apparent that the jurors believed that defendant played an active part in the murder of Strickland and was not a "passive accomplice" as defendant argues. This assignment of error is without merit.

## XIII.

[19] In his next assignment of error, defendant contends that the trial court erred by submitting the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a

lawful arrest, N.C.G.S. § 15A-2000(e)(4). This circumstance was submitted to the jury only in the case of Margaret Strickland. Defendant argues that although there was evidence tending to show that his accomplices were motivated by this purpose, there was no competent evidence introduced at trial or sentencing proving that defendant was similarly motivated.

Defendant's argument, however, misconstrues the law as this Court has interpreted it. N.C.G.S. § 15A-2000(e)(4) provides, in pertinent part, that the murder was committed "for the purpose of avoiding or preventing a lawful arrest." As this Court pointed out in *State v. Hunt*, 323 N.C. 407, 373 S.E.2d 400 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), this circumstance speaks only of "*a* lawful arrest." The Court then determined that "[i]t need not be the defendant's own arrest." *Id.* at 432, 373 S.E.2d at 416.

Having clarified this, we conclude that in the present case, there was evidence that Strickland's murder was committed for the purpose of "preventing a lawful arrest." Although defendant testified that Leggett shot Strickland, defendant conceded that she was killed to eliminate her as a witness to the crimes involved. On cross-examination, defendant testified as follows:

Q. But you specifically remember that [Margaret Strickland] was shot and killed because she was a witness and could testify and identify about what happened?

A. That she knew Kwame Teague, yes.

Q. Right, but that she was a witness to the killing of Bobby Stroud; isn't that correct.

A. Yes.

Q. No question in your mind that's the reason she was killed that she was a witness to what happened?

A. Yes.

Q. And eliminated for that reason?

A. Yes.

Accordingly, there was sufficient evidence to support the submission of the (e)(4) aggravating circumstance. This assignment of error is overruled.

STATE v. LEMONS

[348 N.C. 335 (1998)]

## PRESERVATION ISSUES

Defendant raises eight additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred by denying defendant's motion to examine jurors concerning parole eligibility; (2) the trial court erred by placing the burden of proof on defendant with respect to mitigating circumstances and in defining the burden of proof; (3) the trial court erred by instructing that jurors were permitted to reject mitigating circumstances on the basis that they have no mitigating value; (4) the trial court erred by failing to instruct that jurors "must" rather than "may" consider mitigating circumstances at Issues Three and Four; (5) the trial court erred by instructing the jury that each juror may consider only mitigating circumstances found by that juror; (6) the trial court erred by failing to instruct the jury that unless the aggravating circumstances outweighed the mitigating circumstances, a life sentence should be imposed; (7) the trial court erred by failing to clearly instruct the jury that it should answer "no" to Issues Three and Four unless the jury unanimously answered these issues "yes"; and (8) the North Carolina death penalty statute is unconstitutional.

Defendant raises these issues for purposes of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[20] Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of two counts of first-degree murder on the basis of malice, premeditation, and deliberation and also under the felony murder rule. With respect to the murder of Margaret Strickland, the jury found the aggravating circumstances that the murder was committed to prevent arrest or effect escape, N.C.G.S. § 15A-2000(e)(4); that the murder was com-

mitted while defendant was engaged in the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); that the murder was committed while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murder was part of a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(11). With respect to the murder of Bobby Stroud, the jury found the aggravating circumstances that the murder was committed while defendant was engaged in the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); that the murder was committed while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and that the murder was part of a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(11).

We conclude that the evidence supports each aggravating circumstance found. We further conclude, based on a thorough review of the record, that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* at 244, 433 S.E.2d at 164. Although we review all of

STATE v. LEMONS

[348 N.C. 335 (1998)]

these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

However, we find that the present case is distinguishable from each of these seven cases. First, defendant was convicted of two counts of first-degree murder. As this Court has previously noted, we have never found the sentence of death disproportionate in a case where the defendant was found guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). Further, the jury convicted defendant on the theory of malice, premeditation, and deliberation and also under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Finally, this Court has never found a death sentence to be disproportionate in a witness-elimination case. " 'Murder can be motivated by emotions such as greed, jealously, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion.' " *State v. McCarver*, 341 N.C. 364, 407, 462 S.E.2d 25, 49 (1995) (quoting *State v. Oliver*, 309 N.C. 326, 375, 307 S.E.2d 304, 335 (1983)), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Here, defendant conceded at trial that Strickland was shot because she was a witness to the murder of Stroud. Further, the jury found the aggravating circumstance that Strickland's murder was committed for the purpose of avoiding a lawful arrest, N.C.G.S. § 15A-2000(e)(4).

We recognize that juries may have imposed sentences of life imprisonment in cases which are similar to the present case. However, this fact "does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. This Court has long rejected

a mechanical or empirical approach to comparing cases that are superficially similar. *Robinson*, 336 N.C. at 139, 443 S.E.2d at 337. This Court independently considers "the individual defendant and the nature of the crime or crimes which he has committed." *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled in part on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543, *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306, *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517.

Defendant contends that the sentence of death entered against him is disproportionate because his two accomplices, Teague and Leggett, both received life sentences. Defendant argues that there is no clear evidence indicating that he was more culpable than his alleged accomplices and that there is a strong possibility that he is less culpable than either of them.

In support of his position, defendant cites *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (finding death penalty disproportionate where equally or more culpable accomplice received life sentence in separate trial). However, *Stokes* is distinguishable from the present case. First, in *Stokes*, the defendant was convicted of only one count of first-degree murder under the theory of felony murder. In the present case, defendant was convicted of two counts of first-degree murder under both premeditation and deliberation and the felony murder rules. Further, in *Stokes*, Chief Justice Exum noted that

> Stokes was only seventeen years old when he murdered Kauno Lehto; Murray [his accomplice] was considerably older. There also is evidence that Stokes suffered from impaired capacity to appreciate the criminality of his conduct, and that he was under the influence of a mental or emotional disturbance at the time of the murder. Moreover, because the jury found the existence of "one or more" mitigating circumstances without specifying which ones, we must assume the existence of each mitigating factor the trial judge submitted and the evidence supported, including those involving age, mental or emotional disturbance, and impaired capacity.

*Id.* at 21, 352 S.E.2d at 664.

Here, defendant was twenty-six years old at the time the murders were committed. Further, there was no evidence presented that defendant suffered from impaired capacity to appreciate the criminality of his conduct or that he was under the influence of a mental

or emotional disturbance. Finally, in the present case, there were five aggravating circumstances found in the Strickland case and three found in the Stroud case, compared to the single aggravator found in *Stokes*. *Stokes* is thus clearly distinguishable from the present case and does not support defendant's contention that the sentences of death entered against him are disproportionate.

The fact that defendant was not the actual shooter of the victims does not make his participation in the crime any less culpable. Our case law supports this proposition by providing for the "friend" exception to the "mere presence" rule. Thus, a defendant may be guilty of a crime by his mere presence if the perpetrator knows the friend's presence will be regarded as encouragement and protection. *See Gaines*, 345 N.C. at 677, 483 S.E.2d at 414. As Justice Mitchell (now Chief Justice) warned in his dissent in *Stokes*, this Court should not substitute its view over that of the jury as to what the evidence actually established. *Stokes*, 319 N.C. at 33, 352 S.E.2d at 671 (Mitchell, J., dissenting). Here, the jury could reasonably find that defendant's actions warranted the death penalty. We will not overturn the jury's determination simply on the basis that defendant's two alleged accomplices received life sentences.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.